**BRITISH AIRWAYS BOARD and Compagnie Nationale Air France, Plaintiffs,**

v.

**The PORT AUTHORITY OF NEW YORK AND NEW JERSEY et al., Defendants.**

**No. 76 Civ. 1276.**

United States District Court, S. D. New York.

May 11, 1977.

William C. Clarke, New York City, for plaintiff British Airways Board; Covington & Burling, Washington, D.C., John Michael Clear, Peter John Nickles, Washington, D.C., of counsel.

Rogers & Wells, New York City, for plaintiff Compagnie Nationale Air France.

Patrick J. Falvey, Joseph Lesser, New York City, for defendants.

Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, for Friends of The Earth, et al., by Geoffrey Kalmus, Charlotte M. Fischman, New York City, of counsel, amicus curiae.

John F. Hellegers, Washington, D.C., for Environmental Defense Fund, amicus curiae.

William D. Denson, New York City, for Town of Hempstead, amicus curiae.

POLLACK, District Judge.

The British Airways Board and Compagnie Nationale Air France, plaintiffs herein, have brought a declaratory judgment and injunction suit against The Port Authority of New York and New Jersey ("PA" hereafter) and its Commissioners, named as defendants, to declare invalid the PA's resolution of March 11, 1976. That resolution denies permission to the plaintiffs, until further action of the PA Board, to engage in experimental test flights of the Concorde, to and from John F. Kennedy International Airport (JFK) located on Long Island, New York.

The plaintiffs claim that the PA resolution offends relevant international treaties and agreements, and illegally invades an area of regulation which has been generally preempted by the federal government and specifically preempted by the controls exercised by the orders of the Secretary of Transportation and the Federal Aviation Administrator which allegedly authorize Concorde operations at JFK.

The defendants assert that the PA as the JFK airport proprietor, has the legal right to investigate the noise tolerability of the Concorde and meanwhile to exclude the Concorde from landing and take-off from JFK in scheduled commercial operations, absent an express declaration from the federal authorities that they have superseded local authority in this regard; and that no federal agency can use private or state property even for scientific explorations without their consent. In short, defendants urge that Congress has not clearly preempted a local airport operator's powers to accept or reject aircraft for landing and take-off at its airport; that there is no express federal preemption with respect to regulation of noise by local airport operators.

The issues are presented to the Court on plaintiffs' motion for summary judgment. All parties are in agreement that there is no factual issue which is material to the disposition of this motion. The plaintiffs submitted a statement pursuant to Rule 9(g) of the General Rules of this Court setting out material facts to which there was no response and the facts so set out are not controverted by defendants.

For the reasons set out hereafter, the plaintiffs' motion for summary judgment is granted.

I.

*The undisputed facts*

The plaintiffs' 9(g) statement sets forth that the plaintiffs are foreign air carriers engaged in foreign air transportation and

hold permits issued by the Civil Aeronautics Board ("CAB") approved by the President of the United States authorizing them to engage in foreign air transportation of persons, property and mail respectively between London or Paris and New York. They each hold operations specifications issued by the Federal Aviation Administration ("FAA") which specify in each case that it may conduct operations at New York through JFK, and which, "pursuant to the Decision and Order of the Secretary of Transportation, February 4, 1976, have been amended to specify that it may conduct operations at JFK and Dulles International airports with Concorde" aircraft subject to certain conditions and limitations. The PA maintains and operates JFK under lease from the City of New York.

The 9(g) statement further recites that: On February 4, 1976, William T. Coleman, Jr., United States Secretary of Transportation ("the Secretary"), rendered a Decision and Order authorizing plaintiffs to conduct limited scheduled commercial operations of the Concorde aircraft to and from the United States for a trial period not to exceed 16 months.

The Secretary's Decision and Order ordered the Administrator of the FAA to amend the operations specifications of British Airways and Air France to permit, subject to the terms and conditions set forth in the Decision and Order, two Concorde flights a day by each plaintiff into and out of JFK and one Concorde flight a day by each plaintiff into and out of Dulles International Airport ("Dulles") in Virginia, serving Washington, D.C. The operations specifications were so amended on April 6, 1976.

By letter dated March 11, 1976, plaintiffs notified the Authority of their intention to schedule commercial flights at JFK beginning on or about April 10, 1976. On March 11, 1976, the Authority purported to deny permission to plaintiffs to operate the Concorde into or out of JFK, asserting, as grounds for its decision, a

desire to make an independent evaluation of noise data and community reaction relative to the Concorde, based upon operating experience at Dulles Airport, Heathrow Airport in London, and Charles de Gaulle Airport in Paris.

## II.

### The legal issues before the Court

#### (a) Preemption

A straightforward question of federal supremacy is raised in this case. The Court is drawn to this issue only to declare the scope of the congressional grant of federal power in the premises, the scope of the exercise thereof by the federal authorities and whether the local action by the PA clashes therewith or with the effective exercise of the nation's foreign policy or with the nation's agreements with foreign countries.

The Concorde is a supersonic transport aircraft of European design, manufactured jointly by the British and French and is the first commercial transportation application of the new supersonic technology used for military aircraft for over 20 years. The Court is not involved in the wisdom of the federal action or the objective or subjective acceptability of the noise levels of the Concorde. The local proprietor of JFK has banned the Concorde from a provisional, limited try-out at JFK while the PA investigates the noise quotient of the aircraft. The government's purpose in authorizing the tests is to obtain actual operational data in the interests of scientific technological progress and aviation policy. These operations were to correctly assess and reach proper conclusions on the economic and environmental impact from actual operational data. If indeed there are defects in this generation of the aircraft then the tests would serve toward conceivable development of a cleaner, quieter, more efficient supersonic transport.

Congress has placed with the federal Administrator [1] the regulation of the use of

---

1. All functions, powers, and duties of the Federal Aviation Agency and of the Administrator

and other offices and officers thereof were transferred by Pub.L. 89–670, Oct. 15, 1966, 80

navigable airspace. Federal Aviation Act of 1958, 49 U.S.C. §§ 1301–1542 (1970).

Congress has (in 49 U.S.C. § 1353(a, b, c) directed the federal Administrator under the head of "Development Planning" to make long range plans for and use of navigable airspace; and location of landing areas. Congress has empowered the Administrator to undertake or supervise such developmental work and service testing as tends to the creation of improved aircraft, aircraft engines and appliances. And Congress has placed duties on the Administrator to conduct aircraft research and development and testing and evaluation thereof.

(c) The Administrator shall develop, modify, test, and evaluate systems, procedures, facilities, and devices, as well as define the performance characteristics thereof, to meet the needs for safe and efficient navigation and traffic control of all civil and military aviation [with exceptions not here relevant] . . . and select such systems, procedures, facilities, and devices as will best serve such needs and will promote maximum coordination of air traffic control and air defense systems. . . .

Within that mandate it has been appropriately held that test flights of commercial supersonic transports (such as the Concorde) in the course of a sonic boom program were an appropriate exercise of the Administrator's function. The tests ordered were to determine public acceptability and effect on ground structures of anticipated booms as a result of the flights. Such tests tend to the creation of improved aircraft. *Coxsey v. Hallaby* (W.D.Okl. 1964), 231 F.Supp. 978, where the Court said:

The FAA is authorized under the provisions of 49 U.S.C. § 1353(b) to conduct tests which tend to the creation of improved aircraft. The SST clearly falls within the category of such 'improved aircraft.' (p. 979)

Stat. 931 to the Secretary of Transportation, with the functions, powers and duties of the Secretary of Transportation pertaining to aviation safety to be exercised by the Federal Avia-

Congress has defined the responsibilities of the Secretary of Transportation in respect of leadership, consultation and coordination. 49 U.S.C. § 1653. Subdivision (a) thereof provides:

The Secretary in carrying out the purposes of this chapter shall, among his responsibilities, exercise leadership under the direction of the President in transportation matters . . . provide leadership in the development of national transportation policies and programs, and make recommendations to the President and the Congress for their consideration and implementation; promote and undertake development, collection, and dissemination of technological, statistical, economic and other information relevant to domestic and international transportation; . . . promote and undertake research and development relating to transportation, including noise abatement, with particular attention to aircraft noise; . . . .

*(b) The federal decision to test the Concorde.*

After extensive public hearings and consideration of environmental impact statements, the public interest, environmental protection, noise control and other relevant matters involved, the Secretary of Transportation issued his order of February 4, 1976. This directed the Federal Aviation Administrator to permit British Airways and Air France, for a period of 16 months, on a provisional and restricted basis, to conduct up to two scheduled commercial flights per day of the Concorde into JFK and one flight per day into Dulles Airport, by each carrier. A series of careful restrictive terms to minimize noise annoyance conditioned this provisional grant. A saving clause made the permit revocable on four months' notice, or immediately in the event of an emergency deemed harmful to the health, welfare or safety of the American people.

tion Administrator in the Department of Transportation. See sections 1655(c) and 1657(f) of Title 49 U.S.C.

Acting on the Secretary's decision, the Federal Aviation Administrator on April 2, 1976 issued unequivocal amendments to the operations specifications for each carrier to conduct the authorized flights to and from JFK and Dulles.[2] These included specific technical departure procedures for purposes of noise abatement.

The amendments to the Operations Specifications under the Secretary's instruction read, in part: "The air carrier is authorized to conduct two Concorde flights a day, scheduled or chartered, to and from John F. Kennedy International Airport, New York, New York, and one scheduled flight a day to and from the Dulles International Airport, Washington, D.C., for a period not to exceed 16 consecutive months."

Meanwhile, the PA adopted its resolution of March 11, 1976 banning the Concorde from JFK, until further action of the Board, without a factual trial at JFK. The ostensible purpose was to enable the PA to evaluate Concorde noise on at least six months of operating experience at Dulles Airport and also at Heathrow and de Gaulle Airports, the community reaction thereto and the results of the monitoring program at Dulles and to secure additional information concerning the Concorde's noise and other environmental characteristics.

Reacting thereto, the Secretary of Transportation issued a public statement mentioning *inter alia* that many transatlantic passengers originate or terminate their flights in New York, that he believed the unique interests of the citizens of New York are adequately protected by the prescribed strict limitation on the number of flights, the close monitoring of aircraft by the federal agencies and the safeguard allowing immediate termination for cause in the public interest. He added:

I might add that it seems to me it is also in the interest of New York as the major commercial center on the east coast to participate in the demonstration of a new technology that could be a significant benefit to international commerce.

\* \* \* \* \* \*

It is in any event in the national interest to begin as much of the demonstration as possible as soon as possible.

The federal orders provide a curfew—no flight may be scheduled for landing or take-off in the United States before 7 A.M. or after 10 P.M. The period of exposure to the aircraft noise on take-off would be short, generally under a minute—or less than four minutes a day in all at JFK. The four authorized flights into and out of JFK would constitute up to a daily total of eight operations out of a current daily average total of nearly one thousand operations at that airport.

The Secretary observed that it would obviously be extremely unfortunate if the provisional test flights did not go forward.

The PA held firm to its resolution nonetheless, precipitating the filing of this suit to remove the block to a fair trial of the Concorde at JFK under closely limited test circumstances.

### III.

### *Legislative, administrative and case histories*

The leading federal act governing air commerce is the Federal Aviation Act of 1958, 49 U.S.C. § 1301, *et seq.* The statute is broadly drafted and as expressed leaves no doubt of adequate statutory authority to land the Concorde at JFK.

Congress added an express noise abatement provision to the Act in 1968, 49 U.S.C. § 1431. This statute again was broadly drafted and its express provisions

---

2. The instruction of the Federal Aviation Administrator of April 2, 1976, to the Assistant Administrator stated *inter alia*, "Specific operating and scheduling conditions have been inserted into the operations specifications consistent with the February 4, 1976 decision of the Secretary of Transportation . . . The amendment as approved permits regular Concorde service to only John F. Kennedy International Airport in New York and Dulles International Airport serving Washington, D.C. . . It is directed that the operations specifications be issued to the carriers."

leave no doubt of adequate statutory authority paramount to that of airport proprietors in the regulation of noise and noise abatement. The Act passed by Congress is facially unequivocal and makes clear the federal government's exclusive statutory responsibility for noise abatement through regulation of flight operations and aircraft design.

The Senate Report in connection with the enactment stated:

> However, the proposed legislation will not affect the rights of a State or local public agency, as the proprietor of an airport, from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners acting as proprietors can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory.
>
> Just as an airport owner is responsible for deciding how long the runways will be, so is the owner responsible for obtaining noise easements necessary to permit the landing and takeoff of the aircraft. The Federal Government is in no position to require an airport to accept service by larger aircraft and, for that purpose, to obtain longer runways. Likewise, the Federal Government is in no position to require an airport to accept service by noisier aircraft, and for that purpose to obtain additional noise easements. The issue is the service desired by the airport owner and the steps it is willing to take to obtain the service. In dealing with this issue, the Federal Government should not substitute its judgment for that of the States or elements of local government who, for the most part, own and operate our Nation's airports. The proposed legislation is not designed to do this and will not prevent airport proprietors from excluding any aircraft on the basis of noise considerations.

This congressional statement refers, not to any restriction on the pervasive power granted in the statute, but to the voluntarily granted authority as matter of FAA policy, delegated to local airport proprietors in the matter of regulating noise. This delegation was at will and subject to the ultimate pervasive federal control.

In 1972 minor amendments were made to this noise abatement provision of the Federal Aviation Act of 1958. 49 U.S.C. § 1431 (Supp. III, 1973). Again, the congressional reports made it clear that no change in the existing federal policy toward airport proprietors was intended. Thus, The Senate Bill, which would have contained a provision expressly preempting States from using their police power to pass noise standards unless identical to the federal ones, stated:

> States and local governments are preempted from establishing or enforcing noise emission standards unless . . . identical to standards prescribed under this bill. This does not address responsibilities. or powers of airport operators, and no provision of this bill is intended to alter in any way the relationship between the authority of the Federal government and that of State and local governments that existed with respect to matter covered by section 611 of the Federal Aviation Act of 1958 prior to enactment of the bill.

Nonetheless, 49 U.S.C. § 1431 as enacted by Congress makes evident the paramount control of FAA in the field of noise:

> [T]he FAA, after consultation with the Secretary of Transportation and with [the Administrator of the Environmental Protection Agency] shall prescribe and amend . . . such regulations as the FAA may find necessary to provide for the control and abatement of aircraft noise and sonic boom, including the application of such standards and regulations in the issuance, amendment [or] modification . . . of any certificate authorized by this subchapter.

In *City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973) Mr. Justice Rehnquist (in dissent, joined by three other Justices) referring to the foregoing stated:

very likely the authority conferred on the Administrator of FAA by 49 U.S.C. § 1431 is sufficient to authorize him to promulgate regulations effectively preempting local action. (*Id.* at 653, 93 S.Ct. at 1869).

The background of the congressional reports was a federal policy of the FAA delegating to local airport owners the control of noise at their airports by non-discriminatory regulations. This policy undoubtedly stems from the problems arising from case law imposing civil liability on such owners for noise damages through failure to properly exercise their powers of control of land use around airports. *Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). As expressed by the Secretary of Transportation, "a local airport proprietor has had [under the federal policy] authority under certain circumstances to refuse landing rights." [3]

This authority of the local proprietor is subject, in addition to any overriding federal action, to at least two further restrictions. It may not take any action that imposes an undue burden on interstate or foreign commerce and it may not unjustly discriminate between different categories of airport users.

The statement of the Department of Transportation on Aviation Noise Abatement Policy issued November 18, 1976 reads:

> We have been urged to undertake—and have considered carefully and rejected— full and complete federal preemption of the field of aviation noise abatement. In our judgment the control and reduction of airport noise must remain a shared responsibility among airport proprietors, users and governments. (p. 34).

■ However, as already indicated, the policy allowing the airport proprietor to impose use restrictions pertinent to the perceived local noise problem is a delegated authority reviewable by and subject to the overriding control of federal authority

when exercised. The November 18, 1976 statement of the Department of Transportation correctly expresses the caveat that local regulations may not override national purposes:

> While the airport proprietor is best situated to judge the local noise problem and to determine how to respond to it, he is not always in the best position to judge the impact of his noise reduction proposal on the national and international air transportation systems. Pursuant to the general federal interest . . . and the specific FAA responsibility for regulating the air navigation system, the federal government has the obligation to assure that airport actions to meet local needs do not conflict with national and international purposes. (p. 58).

### IV.

### *Relationship of federal and local authority as applied*

Whether the PA resolution is precluded depends upon whether there is conflict between the federal and local regulation which has been attempted with specific reference to Concorde.

■ A purpose of the federal regulator to preempt a specific matter may be found where the local action produces a result inconsistent with a federal ruling under the relevant federal statutes. *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1946). Federal action will, under the Supremacy Clause, invalidate local action where there is "such actual conflict between the two schemes of regulation that both cannot stand in the same area, . . . ." *Head v. New Mexico Board of Examiners*, 374 U.S. 424, 430, 83 S.Ct. 1759, 1763, 10 L.Ed.2d 983 (1963), quoting, *Florida Avocado Growers v. Paul*, 373 U.S. 132, 141, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). This doctrine was recently reaffirmed in *Jones v. Rath Packing Co.*, —— U.S. ——, ——, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977):

---

**3.** PA has had a regulation at JFK since 1951 stating that no jet aircraft shall land at the airport without permission.

Congressional enactments that do not exclude all state legislation in the same field nevertheless override state laws with which they conflict. U.S.Const., Art. V1. The criterion for determining whether state and federal laws are so inconsistent that the state law must give way is firmly established in our decisions. Our task is 'to determine whether, under the circumstances of this particular case, [the state's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'. . . . This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written.

## V.

### The federal authority as applied

■ The Secretary of Transportation rendered a Decision and Order dated February 4, 1976 within his statutory powers, 49 U.S.C. § 1354(a):

The Administrator is empowered to perform such acts, to conduct such investigations, to issue and amend such orders, and to make and amend such general or special rules, regulations and procedures, pursuant to and consistent with the provisions of this chapter, as he shall deem necessary to carry out the provisions of, and to exercise and perform his powers and duties under, this chapter.

There was no need for the Secretary to announce expressly in his decision that he was preempting any regulation of the PA such as the one requiring PA permission for jet aircraft to land at JFK (its only avowed noise regulation). *See City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 633, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). Nor was it necessary to expressly announce that the federal policy "in certain circumstances" to authorize the airport proprietor to regulate noise was inapplicable to the provisional permit granted. The Secretary's decision makes this inapplicability manifest.

The Secretary, at the very outset, defined the issue being addressed:

The issue before me is whether to permit Concorde supersonic transport aircraft, manufactured jointly by the British and French, to operate in limited scheduled commercial service to and from the United States as follows: not more than four flights per day into John F. Kennedy International Airport (JFK) located on Long Island, New York, and not more than two flights per day into Dulles International Airport located in Fairfax and Loudoun Counties, Virginia.

The Secretary's Decision resolved that issue:

I have decided for the reasons set forth below to permit British Airways and Air France to conduct limited scheduled commercial flights into the United States for a trial period not to exceed 16 months under limitations and restrictions set forth below. I am thus directing the Federal Aviation Administrator . . . to order provisional amendment of the operations specifications of [the Airlines] to permit those carriers, for a period of no longer than 16 months from the commencement of commercial service, to conduct up to two Concorde flights per day into JFK by each carrier, and one Concorde flight per day into Dulles by each carrier.

Almost at the outset of the Decision, the Secretary explains the scope of the problem addressed.

This decision involves environmental, technological and international considerations that are as complex as they are controversial, and do not lend themselves to easy or graceful evaluation, let alone comparison. (7).

Contrasting the Concorde with subsonic jets the Secretary stated:

The Concorde is sufficiently different from subsonic jet aircraft in its environmental characteristics that admission on a trial basis and the imposition of different operating requirements are amply justified. (12).

The purpose intended and the federal authority being applied are expressed in the Decision as follows:

As the Secretary of Transportation, I am charged by the DOT Act [Department of Transportation Act, 49 U.S.C. § 1651(a) (1970)] with 'the development of national transportation policies and programs conducive to the provision of fast, safe, efficient, and convenient transportation. . . .' I am directed 'to stimulate technological advances in transportation . . . (and) provide general leadership in the identification and solution of transportation problems. . . . Under the Federal Aviation Act, as amended by the DOT Act, I am also instructed to 'encourage and foster the development of civil aeronautics and air commerce in the United States and abroad.'

The Secretary made evident that the question he was considering and deciding was "whether the Concorde should be permitted to land" (17) and that he was evaluating "any adverse effect on the environment against the benefits to be derived from technological progress and international cooperation" (17). The "benefits" to be gained included, he said, "the knowledge that will be gained from testing the environmental consequences and commercial viability of the Concorde in order to determine whether private capital should be committed to the development of a cleaner, quieter, more efficient SST" . . .. (22).

Expounding on the policy framework and functional basis of his action and tieing it to authority and functions recognizable under 49 U.S.C. §§ 1353, 1653, the Secretary remarked:[4]

As we have benefitted from the advances of science and technology, so we must welcome technological innovation, recognizing that what is new is unknown and that progress is possible only with some tolerance and assumption of risk. (22)

\* \* \* \* \* \*

[History] teaches that the benefits of new technologies are not always readily apparent at the time they are introduced. At various points in our history, if we had not acted with foresight we would never have seen the development of the steamboat, the railroad, or the automobile. The advent of the jets was accompanied by substantial debate and public apprehension. (59–60)

\* \* \* \* \* \*

I believe this demonstration is needed to determine whether a commitment to this new technology should be embraced. (61)

The Decision specifically addresses the noise impact of the Concorde, stating that "noise is the factor which has generated by far the greater part of the controversy surrounding the British and French request" . . .. (42) In assessing the nature of the noise impact the Secretary evaluated its nature and effect, a comparison to that of other aircraft and specifically, "The effect of Concorde noise on residents of the areas around JFK and Dulles" (42). Precisely the same subject as that last mentioned is the subject of the PA resolution of March 11, 1976. The PA has, in the record before the Court and publicly, expressed its role as limited to the question whether the Concorde can meet the noise criteria applicable to its use of Kennedy Airport.

Again, referring to the responsibilities of the Secretary, 49 U.S.C. § 1653, the statute commands that he "shall" "promote and undertake research and development relating to transportation, including noise abatement, with particular attention to aircraft noise". The Administrator is "directed" and "empowered" to and "shall develop, modify, test, and evaluate systems, procedures, facilities and devices . . .." 49 U.S.C. § 1353(a, b, c). He "shall prescribe and amend such regulations as the FAA may find necessary to provide for the control and abatement of aircraft noise and sonic boom, including the application of such standards and regulations in the issuance, amendment, modification, suspen-

---

**4.** The absence from the Secretary's Decision of a reference by statutory number of a statute relied on herein is of no relevance. It is the content of the Decision which is expressive of its grounds. The Decision explicitly and in detail shows that the grounds relied on by the Secretary are within the scope of the statutes mentioned in this Opinion.

sion, or revocation of any certificate authorized by this title." 49 U.S.C. § 1431 (Supp. III, 1972).

Analyzing the accumulated date before him, the Secretary makes the following findings:

The noise analysis is quite complete, and yet it gives me no clear direction, . . the cumulative noise figures show that hundreds of thousands of people would find that they lived in a somewhat noisier environment . . .. (48)

To clarify the context in which we are operating, I might note that an air carrier could, without amending its operations specifications, increase the total noise around an airport more than it will be increased by the proposed Concorde flights simply by adding a few extra flights by, say, B–707s or DC–8s. (49)

Touching on the need for actual operating data, the catalyst for the experimental test operations at JFK, the Secretary observed:

Perhaps even more significantly, the noise data [on hand] provide me with only a descriptive and statistical view of the noise impact. Noise is not an objective experience; people do not agree on how objectionable a given sound may be. Noise is a source of great irritation to some, but of little to others. People may react more intensely to Concorde noise than they would to another new and equally loud source, merely because of the controversy which has surrounded the introduction of that aircraft. (49).

The EIS indicates to me that the marginal impact of six [four at JFK and two at Dulles] additional flights would be small. (50).

Comparing the storm of protest over noisiness on the introduction of jet aircraft engines into commercial service and the technological advances thereafter, the Secretary wrote that "Similar technological advances are believed possible with the SST" (52). "Only through actual operations will the nature of the demand for supersonic travel become clear" (52).

## VI.

### *The conclusions reached by the federal Administrator*

The Secretary concluded that "on the basis of currently available information", noise and other impact "are not significant reasons for denying limited operations" (57); "the limited flights under consideration will have a negligible impact on total aircraft noise exposure at Dulles and only a marginally incremental impact at JFK" (58). "I believe that this environmental cost is outweighed by the benefits that will accrue to the American people from the demonstration," (58) i. e., "from observing first hand the application of this technology" (60).

The Secretary completes his findings on the test operations with the statement that "I believe that this demonstration is needed to determine whether a commitment to this new technology should be embraced" (61).

To those concerned with the view that opening the door to test operations necessarily spells letting down the flood gates to the Concorde, the Secretary emphatically rejects their fears that inertia alone would control:

I cannot emphasize too strongly that my decision today is firmly and unequivocally limited to not more than six flights per day [four at JFK], and that the authority I grant is provisional for 16 months from the commencement of operations, if not revoked earlier. (23)

I would not hesitate to bar an expansion of the number of flights or indeed even an extension . . . if . . . the demonstration shows that the noise or emissions have a significant adverse impact on the environment. (24)

## VII.

### *Irreconcilable conflict voids the local action*

Self-evidently then, the PA resolution in effect nullifying the permits to the air carriers based on a purpose of PA to re-review the noise criteria applicable to the use of

**1226**

the Concorde at JFK, is in irreconcilable conflict with the federal examination of the question and the federal orders thereon and the PA resolution must give way under the Supremacy Clause in the Constitution. At the hearing of the motion, counsel for PA responded to the Court's inquiries as follows:

THE COURT: Do you concede that the Secretary of Transportation has the power to order scientific studies?

MR. FALVEY: Yes, he does, but that does not mean—

THE COURT: Has he ordered a scientific study in this case?

MR. FALVEY: Yes, he has.

THE COURT: To determine the technology?

MR. FALVEY: Yes, he has. (Mins. 83–84)

\* \* \* \* \* \*

THE COURT: Aren't his powers of control of development planning and noise control and abatement and the promotion and undertaking of research and development superior to the authority of the Port Authority?

MR. FALVEY: Yes, your Honor, but that's got nothing to do with how they use a particular airport which is the key point here. (Mins. 84).

Later Mr. Falvey expressed the erroneous view that: "What you need for the Federal Government to supersede local authority would be an express declaration that it has superseded local authority." Labelling the action taken would seem to be superogation.

Nullification or stultification of the federal review of the noise problem at JFK is not a prerogative of the PA. The superseding federal orders were founded in federal statutes or regulations. *See* 61 Va.L.Rev. 1299, 1331 (1975). The PA resolution of March 11, 1977 is void and plaintiffs are entitled to the declaration and injunction they seek.

It is unnecessary to treat the other grounds on which plaintiffs seek relief, viz.,

the claimed conflict of the PA resolution with international agreements and foreign policy. Those grounds are not applicable to experimental tests which are the only subject matter ruled on by the Secretary and banned by the PA.

Submit judgment in accordance with this decision within 10 days hereof, after counsel have conferred on the form of the proposed judgment.