BRITISH AIRWAYS BOARD and Compagnie Nationale Air France, Plaintiffs,

v.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, William J. Ronan, W. Paul Stillman, James G. Hellmuth, Victor R. Yanitelli, Milton A. Gilbert, James C. Kellogg, III, Alan Sagner, Joseph F. Cullman, III, Jane Engelhardt, Lewis L. Glucksman, Robert F. Wagner, Commissioners of the Port Authority of New York and New Jersey, and Howard Schulman, Commissioner Designate of the Port Authority of New York and New Jersey, Defendants.

No. 76 Civ. 1276 (MP).

United States District Court, S. D. New York.

Aug. 17, 1977.

---

William C. Clarke, New York City, for plaintiff British Airways Bd.; Covington & Burling, Washington, D. C. by John Michael Clear, Peter John Nickles, Washington, D. C., of counsel.

Rogers & Wells, New York City, for plaintiff Compagnie Nationale Air France; John A. Wells, Stanley Godofsky, Stephen Froling, New York City, of counsel.

Patrick J. Falvey, Joseph Lesser, New York City, for defendants.

Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, for Friends of The Earth, et al.; Geoffrey Kalmus, Charlotte M. Fischman, New York City, of counsel.

John F. Hellegers, Washington, D. C., for Environmental Defense Fund.

William D. Denson, New York City, for Town of Hempstead.

### Decision

POLLACK, District Judge:

This case is before the Court on remand for an evidentiary hearing on whether the delay (now 17 months) by the defendant, Port Authority (PA), in determining whether its existing or other noise regulations shall be applicable to the supersonic jet transport "Concorde" and whether the ban meanwhile of operations thereof at John F. Kennedy International Airport (JFK) are reasonable or constitute unfair discrimination and an undue burden on commerce.

The evidentiary hearing has been held and the matter was duly submitted for decision on the proofs adduced and the arguments and briefs thereon.

Upon due consideration thereof the Court concludes that the delay has been excessive and unjustified and that the ban is discriminatory, arbitrary and unreasonable. The Concorde thereby has been deprived of an opportunity to show that it is environmen-

tally acceptable at this international airport. The Court's findings thereon follow.

## I.

The plaintiffs, British Airways and Air France, are international air carriers who manufacture and operate the Concorde which they desire to place in transatlantic service to and from JFK.

The defendant, Port Authority, is a joint agency of the States of New York and New Jersey and is the lessee and operator of JFK. The individual defendants are the PA commissioners.

On February 4, 1976, pursuant to his statutory powers, 49 U.S.C. § 1354(a), following an exhaustive study and receipt of a final environmental impact statement (EIS) from the Federal Aviation Administration (FAA), the then Secretary of Transportation, Hon. William T. Coleman, Jr. directed amendment by FAA of the operating specifications held by plaintiffs so as to license experimental test operations of Concorde in transatlantic service to and from Dulles International Airport and to and from JFK on a limited basis for a limited period under closely prescribed conditions. *See* 14 C.F.R. § 129. The operations at Dulles have gone forward accordingly.

On March 11, 1976, following notice from plaintiffs of intended commencement of such operations at JFK, the PA banned SSTs from JFK pending an announced six-month study of the environmental effects of the Concorde including a study of its operating experience at Dulles, DeGaulle and Heathrow airports. The PA's avowed purpose was to have an opportunity to set noise standards applicable to SSTs. It did not and has not done so. Instead, after the remand was ordered, the PA extended its ban indefinitely, ostensibly to do further research and analysis on the subject matter. The scope of the further studies is nebulous and undefined (the consultant was asked to devise a program), and nothing has been undertaken or funded (it is speculated that $500,000 to $1,000,000 would be required therefor). Meanwhile, the Concorde is being deprived of a chance to prove itself environmentally acceptable at JFK, even by limited experimental tests.

## II.

Air commerce is governed by the Federal Aviation Act of 1958, 49 U.S.C. § 1301, *et seq.* An express noise abatement provision was added to the Act in 1968, 49 U.S.C. § 1431. Minor amendments were made in 1972 to this noise abatement provision. 49 U.S.C. § 1431 (Supp. III, 1973).

In establishing the national scheme of control of aviation by the statutes cited, Congress indicated that it was reserving to local airport proprietors what the Court of Appeals has termed as the "limited role" of promulgating reasonable nonarbitrary and nondiscriminatory regulations to establish acceptable noise levels for the airfield and its environs. "Any other conduct by an airport proprietor would frustrate the statutory scheme and unconstitutionally burden the commerce Congress sought to foster." *British Airways, et ano. v. Port Authority, etc., et al.,* 558 F.2d 75 at 84 (2d Cir. 1977).

The Court of Appeals has held herein that Secretary Coleman's order for a trial of the Concorde at JFK did not collide with or preclude the initial noise study and ban by the PA.[1] However, it held also that implicit in the responsibility reserved to the airport proprietor in the federal scheme "is the assumption that this responsibility will be exercised in a fair, reasonable and non-discriminatory manner." (*Ibid.* at 82).

The federal aviation and noise control statutes and licensing regulations evidence the national character of the instant subject matter and local environmental restrictions are binding on federal li-

1. The federal government, in an *amicus* brief filed in the Court of Appeals, described the PA delay as a possible abuse of its proprietary power and suggested that it may have unfairly and unreasonably withheld a decision under the guise of studying the matter. The Court of Appeals declined to pass on that question in advance of its tender to the District Court in an adversary, evidentiary hearing.

censes only if the local action is reasonable and nondiscriminatory. *Cf. Douglas v. Seacoast Products, Inc.,* —— U.S. ——, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977). "Congress has left room only for local action that advances and is consistent with federal policy; other noncomplementary exercises of local prerogative are forbidden." (*British Airways, supra,* p. 84). The reserved national and international interests of the United States and of private parties licensed thereunder may not be negated or prejudiced by the invalid use of a prior opportunity of the local airport proprietor of an international facility to set noise standards under which aircraft may operate there.

■ There are no absolute standards by which it may be determined whether a local owner is exercising an allocated, coordinated right of regulation with reasonable dispatch. What is reasonable can be decided only in the light of the general and specific problems facing the owner, and on evaluation of the manner in which those problems are addressed and handled under the circumstances. *Deering Milliken, Inc. v. Johnston,* 295 F.2d 856, 867 (4th Cir. 1961).

In light of its regulatory privilege and responsibility to control aircraft noise at JFK, a review of the reasonableness of the P.A.'s present ban starts with an examination of what was known or available to it when the ban was imposed and of the justifiability of its delay in setting a different noise standard than the one which P.A. now applies to all jet aircraft.[2]

### III.

In 1951, the P.A. prohibited operation of jet aircraft at JFK without its permission. A consulting firm was thereafter retained to assist P.A. to establish a noise standard acceptable to the P.A. for jet aircraft. In 1958, the P.A. established the noise regulation which presently governs the permissible noise level of planes departing from JFK. This regulation applies to jets as well as to aircraft propelled by other means. Take-offs of a plane are prohibited if its level, as measured at selected monitoring sites around the airport, exceeds 112 PNdb (perceived noise decibels).

1. *What Was Known About Concorde on March 11, 1976*

a) *Noise*

When an aircraft travels, it sends energy through the air. This energy ("sound")[3] has two basic physical characteristics, frequency and intensity. It is possible to represent a given sound at a specific place and time by setting out its frequency components and the intensity of each of these components. Such a representation is termed the "spectrum" of the sound.

Human reaction to sound—the perceived loudness and noisiness of a particular sound—is not solely a function of the physical intensity of the sound. Rather, this perception is affected by such factors as the frequency components and duration of the sound stimulus. For instance, high frequency sounds are generally perceived to be more noisy than low frequency sounds of the same physical intensity or energy level.

Psychoacoustics is that branch of science which examines the relationship between the physical characteristics of sound energy and the psychological reaction of persons subjected thereto. The delineation of this relationship has made possible the development of psychoacoustic noise measures—units of measurement which reflect the human perception of sound. If, for example, people hear a sound with a frequency of 500

2. Familiarity with the Court of Appeals' opinion herein is assumed. That opinion contains a good deal of the relevant historical background some of which may be repeated here for the sake of continuity. This Court's decision on the original submission hereof, reversed on appeal, is reported at 431 F.Supp. 1216 (S.D.N.Y. 1977). The holding therein, not accepted on appeal, was that the P.A. ban irreconcilability conflicted, as matter of law, with federal orders which had preempted the field.

3. Although referred to herein as "sound", not all of this energy which travels in the form of the movement of air molecules can be heard by the human ear; sometimes the sound's frequency will be too high or low to be perceived by the human ear.

hertz as being more noisy than an equally intense sound of 250 hertz, then a psychoacoustic measure of noisiness would apply differential weightings to the physical intensities of sounds at these two frequencies, in order to equate them in terms of perceived noisiness.

The PNdb unit employed in the P.A.'s present noise standard is just such a unit, one designed to penalize the high-pitched whine of subsonic jets, a whine found to be irritating to persons on the ground. The 112 PNdb standard was selected because studies showed that an ordinary person perceives 112 PNdb emitted by a subsonic jet as equivalent, in annoyance, to the sound emitted by a piston-engined aircraft. A similar, but more recent measuring unit of this sort is the EPNdb (effective perceived noise decibel) used in the federal aircraft certification noise standards. See 14 C.F.R. Part 36. The EPNdb was established as "the best representation of human reaction to aircraft noise," and factors into the calculation both frequency and time-duration weightings.[4]

These single-event noise measuring units—the PNdb and the EPNdb—may be employed to describe the noise impact of a single aircraft operation in two related manners. First, selected points on the ground may be used as measuring points, and aircraft may be compared based on their noise levels as recorded at these measuring points. This is the system used by the P.A. Measuring points have been selected at various places around the airport, and the criterion is whether an aircraft produces sound which exceeds 112 PNdb at these locations.

However, different aircraft have different sound spectra, i. e., different ratios of high to low frequency sound components. Moreover, low frequency sound is propagated through the atmosphere more readily than is high frequency sound (i. e., with less attenuation). Thus, if two aircraft have different spectra, then the difference in their sound levels will not be the same at different locations on the ground.[5] While the noise level of both will decrease with increasing distance from the source, the noise level of the plane with the higher proportion of low frequency noise will decrease somewhat less rapidly.

For this and other reasons, a second system for assessing the impact of a single-event noise exposure has been developed, the "single-event noise contour." (sometimes referred to as "footprint"). Under this system, contours are plotted upon a map of the area surrounding an airport, each contour consisting of geographic points within the area which will receive a particular noise level—measured in PNdb or EPNdb—as a result of a particular aircraft operation into that airport. Unlike single monitoring points, then, single-event noise contours allow for the comparison of the noise levels of different aircraft on a geographic basis:

> "The single-event noise contours, overlaid on maps of the affected areas, yield information about areas of land and numbers of people who will be subjected to noise levels of particular intensities during a single takeoff or landing. This descriptor allows convenient comparison of the geographical extent of the noise impact of different aircraft, such as the Concorde and the Boeing 707, by overlaying the contour of one on the contour of another." *Coleman Decision,* at 44.

In addition to the single-event noise measuring concepts outlined above, there exists various techniques for measuring cumulative noise exposure. Whereas single-event noise measuring units describe the noise level for a given takeoff or landing, cumulative noise exposure techniques measure the total aircraft noise arriving at a

---

4.  Because the EPNdb and the PNdb use different weightings, there is no absolute equivalency between the two units of measurement, though with aircraft slant ranges of between 2,000 and 5,000 feet, the EPNdb will generally be between 0 and 4 db higher than the PNdb.

5.  Other factors which contribute to this phenomenon will be differences between two aircraft with respect to rates of climb, climb gradient, flight path, and thrust setting.

particular geographic point over a 24 hour period. These cumulative noise exposure measurement techniques are useful in ascertaining the incremental noise impact which the addition of a given sound stimulus—e. g., 4 Concorde flights a day—will have upon an already noisy area.

One such cumulative noise exposure measuring unit is the Noise Exposure Forecast ("NEF"); [6] the NEF descriptor includes corrections for irritating whines or discrete frequencies in aircraft noise signatures, and for noises occurring during those periods of the day, such as the late evening, when loud noises are more disturbing. As is the case with single-event noise measurements, geographic points subjected to equal NEF levels may be joined together to create NEF contours or footprints; comparison of the NEF contours obtaining before and after a particular sound stimulus is added to the environment—e. g., Kennedy Airport's NEF contours with and without 4 Concorde flights per day—allows for the assessment of the incremental noise impact of that stimulus upon the environment being considered.

The military have been operating supersonic jet aircraft in the United States and elsewhere for upwards of 20 years. The idiosyncrasies of the aircraft have been well known and described in extensive reference works and studies on the subject. In 1962, Britain and France decided to develop a supersonic jet aircraft for commercial transportation, the Concorde. This country decided not to undertake development of such a plane. Development proceeded slowly and was very expensive and took many years.

A government "Information Brief" dated December 11, 1973 pertaining to the noise impact of the Concorde was publicly released on July 1, 1974 by the Environmental Defense Fund which stated:

"The noise impact from the Concorde is created by two basic considerations—the inherently high noise levels generated by the aircraft and the low frequency spectral content of that noise.

\* \* \* \* \* \*

Based on available information provided by the manufacturers, the chances are about 50–50 that the Concorde can indeed "beat the meter," and comply with the long-standing noise-level regulation at JFK airport."

During the latter part of 1974, the airlines conducted noise tests at Toulouse and Casablanca, directed at establishing the noise levels that would result from Concorde operations at JFK. For this purpose, a series of noise abatement takeoffs were conducted at test sites simulating the departure flight tracks from JFK. (The 112 PNdb standard applies only to takeoffs. [Exh. 55]). (The tests found an average noise level of below 109PNdb, and these results were submitted to the Port Authority. [Exh. 6]).

In March 1975, the FAA released a draft environmental impact statement ("Draft EIS") on Concorde. In terms of noise which is perceived by the ear, the Draft EIS stated that "[the] resultant noise levels of the Concorde are not substantially higher than those of transoceanic subsonic aircraft such as the older Boeing 707 and McDonnell-Douglas DC–8 types."

By 1975, the airlines were ready to commence commercial operations of the Concorde. They so notified the P.A. and also applied to the FAA for an amendment of their operations specifications to permit the limited use of Concorde in transatlantic service to JFK and other airports. See 14 C.F.R. § 129.

The P.A. replied, on May 20, 1975, to the effect that it would consider the ability of Concorde to meet JFK's regulations (presumably the 112 PNdb limit) "including the takeoff procedures as to which we are still

---

**6.** A related though somewhat different cumulative noise exposure analysis technique is the FAA-originated Aircraft Sound Description System (ASDS). The ASDS describes the amount of time per day that a given threshold sound level is exceeded. The chosen threshold level is 85 dbA (equal to approximately 97 EPNdb), and noise is described in terms of the minutes per day during which this 85 dbA level is exceeded.

awaiting data." "Our Commissioners will act upon your request as promptly as possible after the necessary federal action is taken on the draft Environmental Impact Statement and our own evaluation is completed."

In September 1975, the FAA released the final EIS. The measured Concorde noise levels presented in this document were obtained from Concorde flights to the United States—Dulles and Dallas-Fort Worth; Fairbanks, Alaska; Boston-Logan; and Los Angeles, California—together with noise data provided by the British/French Aviation Authorities.

The EIS set out the single-event noise contours of the Concorde for various modes of operation, and did the same for a number of subsonic jets. These footprints were also superimposed upon a map of JFK to allow an appraisal of what area and population density would be impacted by Concorde noise. Concorde's footprints were larger than those of subsonics.

The EIS also set out the NEF contours for JFK with and without the anticipated 4 Concorde flights per day.

In short, the EIS presented a rather complete picture of the noise impact which Concorde flights at JFK could be expected to have; a noise picture complete as to expected noise levels; the geographical extent of those levels and a comparison thereof with those produced by subsonic jets, and the expected population subject to such levels.

#### b) Vibrations

In addition to creating audible sound which may be annoying, aircraft noise may create a source of disturbance to persons on the ground in yet another manner; for aircraft noise energy induces vibrations in houses and other structures on the ground, which structural vibration may in turn cause the vibration of persons and objects within the structures.

This phenomenon is not a new one. It has been known about for at least 20 years. Cf. *Griggs v. Allegheny County*, 369 U.S. 84, 87, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962).

These acoustically induced structural vibrations are potential sources of human annoyance for three reasons: (1) the sensation of one's body moving up and down may cause annoyance ("whole-body movement"); (2) the structural vibrations might result in damage to the structure ("structural damage"); and (3) the knowledge that one's house and possessions are being disturbed may cause annoyance without regard to the possibility of actual damage, because of the "psychological influence of 'private possessions' being disturbed" ("house rattle").

Concorde-induced house vibrations were given extensive coverage in the EIS because it was believed that low frequency sound is the major cause of these vibrations and Concorde has a higher proportion of low frequency energy than do subsonic jets. The EIS found that the Concorde could produce up to five times the low frequency energy and resulting house vibrations of a subsonic jet.

In examining these Concorde-induced house vibrations, the EIS used for its raw data the measured structural vibrations resulting from a Concorde takeoff and landing, the vibrations being measured while the Concorde was at full power or approach power and only 500 feet from the vibrating structure.[7] These data were used since the proximity and aircraft power settings meant that this was the "worst case" possible; no one in an airport area would be subjected to worse vibrations than those being analyzed.

The EIS then set out seven criteria by which to judge the impact of acoustically induced structural vibrations, criteria relating to both structural damage and whole-body movement.

Applying these criteria to the measured Concorde-induced structural vibrations, the EIS concluded that the Concorde did not

---

7. Structural vibrations are measured in terms of the acceleration, velocity or displacement of the vibrating surface (wall, floor, etc.). These three factors are mathematically related, and the measurements are obtained by placing an accelerometer against the relevant surface.

present any danger of causing structural damage, and that although one might experience slight vibrations through the floor or when leaning against a wall, especially during takeoff, the brief duration and low intensity of the vibrations did not present any potential annoyance of significance due to whole-body movement.

With respect to the third type of vibration-produced annoyance—household rattle annoyance due to the notion that one's house and objects are being interfered with—the EIS did not attempt to assess this in terms of any criteria or standards, but stated:

"[Concorde], during the time of a . . takeoff,—approximately 30 seconds—[is likely to induce] some household rattle of dishes, pictures, lamps and other bric-a-brac being disturbed (especially objects in contact with walls). This in turn could produce secondary sources of noise which may disturb people because of the psychological influence of private possessions being disturbed." EIS at VI–97.

Based upon this analysis, Secretary Coleman, in his decision of February 4, 1976, concluded that: "the vibrational characteristics of the Concorde are not a serious objection to the commencement of operations." (Ex. 17, at 44).

In sum, by March 11, 1976, there existed a vast quantity of reference works and studies and known scientific data concerning supersonics, including community response thereto and graphic portrayals thereof. This data pertained to the assessment of supersonic aircraft noise levels, the potential impact upon persons on the ground, the noise and vibration characteristics concerning supersonics and Concorde in particular, and the data to which the assessment techniques had been applied.

Notwithstanding all of the information at hand concerning the Concorde's characteristics and environmental impact, the P.A. did not make a decision as to the acceptability of Concorde operations into JFK and on what noise standards. Instead, on March 11, 1976, the P.A. imposed a "temporary" ban on Concorde's use of JFK, still in effect and now extended indefinitely.

The minutes of the P.A. of March 11, 1976 set out the following:

Although it is claimed that the Concorde would meet the Port Authority's 112 PNdb standard . . . the environmental impact statement and the Secretary's decision raise a number of significant questions concerning the effect of low frequency noise and vibrations generated by the Concorde and the airplane's overall impact on the noise environment in the area surrounding JFK. . . . The unique noise characteristics of the Concorde and the expected aggravated community response to this noise add new and serious dimensions to the present aircraft noise problem, one not necessarily reflected in the Port Authority's current noise standard.

\*　　\*　　\*　　\*　　\*　　\*

It is . . . recommended that the Director of Aviation analyze the Concorde flights at Dulles, Heathrow and DeGaulle Airports and the communities' reaction thereto, and study the results of the Department of Transportation's mandated monitoring program for [a] six month period, and if necessary, request the FAA to modify its program in order to provide the Port Authority with required data, or otherwise secure data, which would enable the Port Authority to apply this information to communities surrounding Kennedy International Airport.

The Board unanimously adopted the following resolution:

RESOLVED, that the Port Authority deny permission to operate any supersonic aircraft . . . at Kennedy International Airport, until after at least six months of operating experience has been evaluated, after a report on such experience has been made to the Board, and

pending further action thereon by the Board;

[T]he Director of Aviation is directed to analyze Concorde flights for a period of six months at Dulles . . . and also at Heathrow and DeGaulle Airports, the community reaction thereto, the results of the Department of Transportation mandated monitoring program at Dulles, and, if necessary, request the FAA to modify such program, or otherwise to secure additional information concerning the Concorde's noise and other environmental characteristics;

[T]he Executive Director . . . is authorized to retain such number of consultants in connection with the foregoing study as he may deem advisable;

[T]he Executive Director and the Director of Aviation . . . are directed, at the end of the foregoing six month program, based upon analysis of noise data and community reaction thereto, to make a recommendation to the Commissioners as to the acceptability of supersonic operations at Kennedy International Airport.

2. *Steps Taken by P.A. after March 11, 1976*

a) *March 11, 1976 to March 7, 1977*

The studies of the P.A., in addition to receipt of data of the Dulles experiment, available on a monthly basis, and studies conducted by NASA on the vibration problem, were supplemented by the work of two consultants. Dr. Karl Kryter was employed on or about May 24, 1976. He is a psychoacoustics expert connected with the Stanford Research Institute and was retained to study Concorde noise and vibrations and their likely impact on JFK. He was to assess the accuracy and validity of the FAA's EIS on the Concorde. Dr. Aubrey McKennell, a British social psychologist was employed on or about November 8, 1976 to conduct an attitude survey and reaction of the residents in the area of Heathrow toward Concorde flights.

Although the record is not clear concerning what steps, if any, Dr. Kryter took to carry out certain of the aforementioned tasks, the evidence is more than adequate to indicate what Dr. Kryter did with respect to Concorde-induced house vibrations—the P.A. claims that it is the need to conduct further study of this vibration factor which alone justifies their continued delay in deciding on Concorde.

Dr. Kryter, by February 1977, was able to predict from his activities the level of vibration which a Concorde and a subsonic airplane at a given PNdb noise level would produce.

In May 1976, Dr. Kryter went to JFK where he made measurements of the aircraft noise and vibrations in typical houses in the airport area.

These noise and vibration levels were recorded on magnetic tape, and were later analyzed with respect to the spectrum, that is, how much sound was causing how much vibration, and in what frequency bands.

In June 1976, Dr. Kryter took noise measurements of aircraft, including Concorde, at DeGaulle and Heathrow Airports, and noise and vibration measurements of aircraft, including Concorde, at Dulles. In about October 1976, he collected additional noise and vibration measurements from Dulles.

Dr. Kryter then took his data—over 1400 separate recordings of aircraft flyovers—and analyzed it to determine the spectrum and overall level of each such event. This analysis was finished by November of 1976.

By February 1977, based upon this data and analysis thereof, Dr. Kryter was able to show the relative spectra shapes of the Concorde and of subsonic jets resulting from different operations, at varying distances from the airport, and when the noises are measured in terms of equal PNdb. There thus emerged a picture showing that if a Concorde is at a noise level, and a 707 is at that same noise level, then for any given mode of operation one could predict the amount of energy at the measuring point in the 20 hertz (maximum vibration producing) range.

Indeed, by this time, Dr. Kryter had "developed a formula that would allow one to a

first order of approximation [to] say that if you had the 707 and the Concorde in a given mode of operation with a given level of noises commonly measured, what the relative difference in potential vibration would be."

In other words, by February 1977, Dr. Kryter had established—for various aircraft and operation modes—the spectra associated with given PNdb levels, and had also devised a formula—the vibration rattle index—which when applied to a given PNdb level or the spectra associated therewith, was predictive of the relative difference in potential vibration; house vibration could now be related to noise levels.

However, within this same January-February time frame, Dr. Kryter also informed the P.A. of one aspect of relating noise measurements to house vibrations which had not been resolved. There still remained the problem of the additivity—in terms of annoyance—of aircraft noise and structural vibrations.

The ultimate purpose of a noise standard is to predict human annoyance. It is for this reason that psychoacoustic measures—those relating a physical stimulus to the human reaction thereto—are used in establishing such standards.

This notion underlies the P.A.'s present 112 PNdb standard. As stated by the P.A.'s then Assistant Supervisor for Aeronautical Planning, Albert H. Odell: "[The] concept of 'perceived noise decibels' (PNdb) [is] a subjective measure of annoyance," "a measure of the *comparability* of . . . noise annoyance. . . ." S. Goldstein & A. Odell, Comments on the Problem of Jet Aircraft Noise, 20, 22 (1966). 112 PNdb was chosen because it was shown that an ordinary person perceived a jet aircraft emitting 112 PNdb as being as annoying as the sound produced by a piston-engined aircraft.

Where, as here, annoyance is claimed to result from two distinct sources—audible sound and house rattle—and where different airplanes create these disturbances in differing proportions, the problem in comparing the annoyance of various aircraft lies in determining the total annoyance created by the combination of these two types of disturbance. Is a Concorde with a PNdb of 110 and a vibration rattle index of 3 more annoying than a B-707 with a PNdb of 112 (or even 110) plus a vibration rattle index of 1?

In February 1977, Dr. Kryter was simply unable to resolve this additivity question (Tr. 138), and he informed the P.A. of the types of research possibly to be attempted for its resolution. The P.A. suggested that he should undertake to outline but did not engage him to perform any such research. Dr. Kryter predicted a need for laboratory and field studies requiring approximately 6 to 12 months to perform and costing in the area of one-half to one million dollars. Dr. Kryter questioned whether he would be interested in undertaking such a project.

By March 1977, then, when Dr. Kryter's final report was due, (Tr. 68), and when the P.A. was to reach a decision concerning landing rights for the Concorde at JFK, (Ex. 39), the only apparent issue remaining for study was the elusive concept of additivity, and the P.A. had to all intents and purposes declined to embark on such study.

b) *March 7, 1977: New Operating Procedures*

Although it was announced that the P.A. was to render a decision on the Concorde following its meeting of March 10, 1977, (Ex. 37, 39), this decision was again postponed because on March 7, 1977, the airlines requested permission to present proposed new Concorde operating procedures to the P.A., procedures designed to reduce the SST's noise impact upon JFK.

The revised procedures entail reduced operating weights, specific runway utilization, and altered aircraft operation, including a new "decelerating approach."

On April 1, 1977, following meetings between airline and P.A. representatives, the airlines submitted a written report of these new operating procedures to the P.A., together with an assessment of the predicted resulting noise impact upon JFK.

The report showed that the effect of the new procedures is to shrink the Concorde's single-event footprint areas at JFK to the point where they are comparable to those of a Boeing 707–320B:[9]

"The airlines and manufacturers consider the noise data presented herein is an accurate assessment of the proposed Concorde operations and is comparable to that of a 707–320B, particularly as large parts of the contours are over water and there is very little difference in noise exposure over populated areas. * * * The N.E.F. contour . . . shows the negligible effect of the proposed [Concorde] operations on the communities surrounding Kennedy Airport. Any difference due to Concorde are well within the one unit N.E.F. increase which normally requires an E.I.S. to be raised.

As it has been clearly established that Concorde can comply with the current monitoring requirements, and this report establishes that the community effects are acceptable, there seems to be no valid reason for any further delay in the Port Authority decision to allow the start of Concorde commercial operations by British Airways and Air France." (Ex. 25, at page 7).

At the request of the PA's director of aviation, the airlines requested FAA confirmation that the aforementioned report is technically valid. By a letter dated April 14, 1977, Charles E. Foster, Director of Environmental Quality of the FAA, responded as follows:

"Your letter . . . requested a technical assessment of your Concorde Noise Performance Report which you presented

to the Port Authority . . . on April 1. * * *

Your report predicts Concorde noise levels lower than those assumed in the Department's 1975 final environmental impact statement, largely because the report is based on new assumptions about Concorde operational procedures at JFK. The Department's EIS assumed departures with maximum gross takeoff weight, usage of the same runways as most of the subsonic traffic, and standardized lateral attenuation of sideline noise . . . .

You are now proposing to take off with approximately 23,000 pounds less fuel than previously assumed. Second, you propose different use of runways from the bulk of air traffic. Third, your technicians have developed a new analysis of ground attenuation specifically related to Concorde. Finally, you propose to use a decelerating approach.

Your analysis is a reasonable prediction of Concorde noise levels if Concordes are operated as you predict which is, of course, subject only to the control of the two carriers operating the Concorde.

* * * * * *

In sum, we believe your analysis is technically sound; if the assumptions it is based upon are borne out in practice, the noise reductions you have shown over our EIS data would be realized." (Ex. 27, at pages 1, 2, and 3 from end).

c) *Since March 7, 1977*

On or about March 8, 1977, Dr. Kryter was apparently assigned a new task—an impact assessment based on the new operating procedures. (Ex. 32). The record does not disclose what steps Dr. Kryter took to carry out this assessment, nor just when, if ever, he completed it, though it must have been completed by July 7, 1977, since Dr. Kryter's final report was presented to the

---

**9.** Annexed as addenda are graphic portrayals of the noise footprints submitted by the airlines showing that Concorde and Boeing 707–320B are comparable in extent in residential areas. The two graphs show three runways each.

Board at that time. Of course, the airlines submitted an assessment based on the new procedures on April 1, 1977, and the FAA approved it on April 14, 1977. And according to Mr. Pattarini, director of Aviation for P.A., the only fair way to determine the validity of the airline's assessment would be to run a Concorde into JFK.

Although there was some testimony to the effect that following the submission of the new procedures, Dr. Kryter was assigned new tasks relating to the vibration rattle index, both Mr. Pattarini and Dr. Kryter testified that Dr. Kryter was never engaged to conduct research into the additivity question.

Finally, with respect to the application of Dr. Kryter's formula—the vibration rattle index—to the new operating procedures, Dr. Kryter testified that he had not received the spectrum for the new decelerated approach, but that he did not expect any great shift in the shape of the spectrum; [10] the record does not disclose whether the formula was applied to those aspects of the new procedures which clearly do not involve any change in the spectrum, or whether it was applied to the decelerated approach in the assumption that no shift in the spectrum would obtain.

On July 7, 1977, following the Court of Appeals' remand of this case to this Court, the Board of Commissioners of the P.A. met in a special session convened in anticipation of the trial scheduled by this Court for July 12, 1977.

At that meeting, the Board reviewed the final reports of its two consultants, Dr. McKennell and Dr. Kryter. The Board was also presented with plates indicating the footprint areas of the B–707 and the Concorde with respect to JFK, the Concorde's footprint area being based on the proposed new operating procedures of March 1977.

The minutes of that meeting state:
"The Director of Aviation reviewed with the Board the preliminary reports thus far received by the General Counsel from the Port Authority's consultants who were retained . . . to aid it in determining the acceptability of Concorde's operations at [JFK]. Based on these reports it appears that the Concorde has unique characteristics including that on landing the Concorde has a high level of low frequency energy. Our reports indicate that the Concorde operations proposed in the [airlines] report of March, 1977 can be expected to result in significant annoyance and complaint activity regarding the noisiness and house vibration effects of Concorde's noise in particular, and an increase in such activity about aircraft noise in general in some communities near JFK. A vibration rattle index is being further studied to quantify this noise factor. However, more research and analysis is needed before such an index can be established.

The Director of Aviation further reported that a final Federal decision on the acceptability of Concorde operations at Dulles Airport should be available by the end of September, 1977.

\*   \*   \*   \*   \*   \*

\*   \*   \*   \*   \*   \*

On the basis of the foregoing, the Executive Director and the Director of Aviation jointly recommended that the Port Authority . . . should continue in force the temporary ban on Concorde operations contained in the Board's action of March 11, 1976. This will give the Board adequate opportunity to fairly evaluate and set noise standards applicable to the Concorde and other supersonic aircraft.

Whereupon, the Board resolved to continue in force the ban on SST operations, including the Concorde, at JFK." (Ex. 49).

Though there is no evidence of this in the record, the P.A.'s brief states that "on July

---

10. Although Dr. Kryter asked the P.A. to ask the airlines to furnish a spectrum of the new decelerated approach, there is no evidence that the P.A. ever in fact made this request to the airlines.

15, 1977, the Authority's Director of Aviation retained George Kamperman of Kamperman & Associates of Illinois to review and critique SRI's work on vibration and to provide the Authority with a report as soon as possible as to what practical steps can be taken to quantify the vibration problem."

## IV.

In perspective, the activity of the Port Authority since it announced its proposed study on March 11, 1976 appears as follows.

The P.A. has been reploughing old ground and doing re-reviews of scientific and theoretical data previously available. Its consultants have undertaken tests at Dulles and JFK on the subject of vibration effects of the Concorde and tests at Heathrow on the community responses. The P.A. has had the advantage of monthly reports from federal authorities on the Concorde operations at Dulles and reports of the studies of NASA on the vibration problem. These reports have not yet yielded an index by which vibration could be measured as additive or unique in terms of the noise spectrum.

The P.A. has learned or confirmed that the Concorde can comply with the current monitoring requirements at JFK for jet aircraft; the Concorde can meet the 112 PNdb noise regulation. The P.A. has no evidence that the community effects of the limited test operations of Concorde as federally authorized are rationally unacceptable. It has obtained evidence that a considerable number of householders in Queens have general objections to an international airport, including residents who settled there variously before and after the airport was established. There was no evidence adduced that the experimental test of the Concorde would appreciably or intolerably worsen present conditions. The P.A. has evidence that vibration is not a noise factor at the low frequency of the Concorde and that any body movement caused is not generally sufficient to be a major source of annoyance. Moreover, it has been shown that nonaircraft events such as doors closing can cause more vibration in structures than does the Concorde.

Dr. Kryter, after a year on the job, testified about the elusive concept of additivity that "I don't know any more today how to add these things together than we did back then." He did acknowledge, however, that data on hand in January 1977 was sufficient to give a rational estimate of a level for noise and a level for vibration. He also stated that tolerability thereof was "a little more pragmatic." When asked what value would an actual run of the Concorde into JFK have on his theoretical studies, the expert's response was: "Well, I think that the actual flights of that type, from a research point of view, would bear out the experience of Dulles. . . . We did not try to assess, we made no studies of whether at JFK the community of people would tend to behave more or differently than an average community, more or less. . . . We were not asked to study it . . .."

The vibrations due to low frequency components of aircraft were evaluated for the proposed test flights by the federal authorities and Secretary Coleman found that:

These vibrations do not present any danger of structural damage and little possibility of annoyance . . .. The vibrations will be slight, brief and barely perceptible. . . ..

Seemingly, the research which Dr. Kryter and Dr. McKennell did undertake for the P.A. is simply redundant and irrelevant to the establishment of a noise standard different from that presently existing at JFK. They established nothing beyond what was adequately considered and reported on by Secretary Coleman.

Concorde has had more than a year of commercial operations at Dulles; more than six years of test flying; and SSTs have been flown by the military for 20–22 years. Noise and vibration data have been collected and collated from all of these operations. Like most other controversial pioneers, the Concorde and its mode of operation were

subject to improvements in their initial form and contemplation. Refinements have been made and reasonably may be expected to be made in the future.

■ It is unreal for P.A. to say we are helpless to quantify theoretically the additive effect of the vibration created by Concorde on Concorde's noise—and at the same time, to bar use of the airport under the circumstances shown herein under the guise of conducting more studies to resolve the unknown aspects of the variables. Yet, this precisely is what P.A. espouses to be concerned with.

■ The conclusion is inescapable from the evidence presented to the Court, and the Court finds that the P.A. has no intention of taking the responsibility of setting the present or another noise standard applicable to the Concorde. Its failure and excessive delay in doing so are unreasonable, discriminatory and unfair and an impingement on commerce and on the national and international interests of the United States.

■ The P.A. has abdicated the limited cooperative authority delegated to it as an airport proprietor and has forfeited its privilege to establish noise regulations for Concorde other than those applicable to jet aircraft at JFK and those embraced in the amended federal specifications granted to the plaintiffs for purposes of the experimental tests.

The Court of Appeals made very clear that:

This delegation of authority, in a field otherwise entirely occupied by the federal government, implies no general restriction on federal power. (*British Airways, supra*, at 83, n.2).

■ Under the circumstances shown, the ban of Concorde from transatlantic service at JFK is an undue interference with achievement of congressional and national objectives. The airlines are consequently entitled to proceed at JFK under the existing regulation of the P.A. for jet aircraft and under the direction of Secretary Coleman and the license of the FAA pursuant thereto.

### V.

The P.A. resolutions of March 11, 1976 and July 7, 1977 are unlawful and void and the plaintiffs are entitled to the declaration and injunction they seek, in accordance with this decision.

The foregoing constitute the findings and conclusions required by Rule 52(a), Fed.R. Civ.P.

A judgment in accordance herewith has been signed and filed.

SO ORDERED.

Appendum [1] to follow.

APPENDUM [1]

JFK Airport
EPNdB noise contours

APPROACHES: RUNWAYS: 04R, 13L, 31R
ISA + 10°C

CONCORDE 102 TONNES ————
707-320B 86 TONNES – – – – –

Residential areas
Open space
Monitoring points

0   4 000   8 000   12 000   16 000 feet

Fig. 6

Appendum [2] to follow.

820

JFK Airport
EPNdB noise contours

APPROACHES: RUNWAYS 13R, 22L, 31L
ISA + 10°C
CONCORDE 102 TONNES ————
707-320B 86 TONNES - - - - -

Residential areas
Open space
⊙ Monitoring points

0   4 000   8 000   12 000   16 000   feet

Fig. 8